786 F.Supp. 1512 (1992)
Keith SPERRY, Plaintiff,
v.
BAUERMEISTER, INC., Defendant,
v.
MICRON POWDER SYSTEMS, Third-party Defendant.
No. 90-2308C(5).
United States District Court, E.D. Missouri, E.D.
March 19, 1992.
*1513 Robert M. Susman, Raskas, Ruthmeyer, Pomerantz, Wynne, Garavaglia & Susman, St. Louis, Mo., for Keith Sperry.
F. Douglas O'Leary, Moser & Marsalek, St. Louis, Mo., for Bauermeister, Inc.
Paul M. Brown, Steven Garlock, Coburn, Croft & Putzell, St. Louis, Mo., for Micron Powder Systems.

MEMORANDUM
LIMBAUGH, District Judge.
Plaintiff has brought a products liability action against defendant Bauermeister for personal injuries he sustained when he attempted to manually clean a spice milling machine. Plaintiff seeks to recover damages under strict liability for defective design and failure to warn; and for negligence. Defendant Bauermeister, the alleged manufacturer, designer, and installer of the spice milling machine (or sometimes referred to as a "system"), has filed a third-party complaint against a component parts manufacturer, Micron Powder Systems, for indemnity and contribution. Defendant/third-party plaintiff Bauermeister alleges that plaintiff's injuries were caused by a defective rotary airlock, manufactured and supplied by third-party defendant Micron Powder Systems (hereinafter referred to as Micron), that had been incorporated into the milling system by defendant Bauermeister. Third-party defendant Micron has filed for summary judgment claiming that, as a matter of law, it is not liable for plaintiff's injuries because the airlock was not a defective component part and that Micron had no knowledge, authority, or control regarding the design or assembly of the milling system or how the airlock was incorporated into the system.
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Co-op. Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. *1514 1348, 1355, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976). With these principles in mind, the Court turns to an examination of the facts.
Plaintiff was employed at Spicecraft doing maintenance work. His work included the operation and cleaning of the milling system which was used to grind spices. On September 2, 1988 plaintiff was operating the milling system when, at some point in time, it required cleaning. He opened up a part of the system known as the airlock and reached down with his right hand into a lower chamber to scrape out spices that had become caked on the side of the chamber. In reaching through the airlock into the lower chamber, plaintiff's hand made contact with a running rotating auger. The auger amputated three fingers on plaintiff's right hand.
Micron manufactures and supplies component parts for various types of machinery. In October 1980, Micron supplied an airlock to Spicecraft. This airlock was Model 6022 with Serial No. 80516A1 (hereinafter referred to as airlock 1). At the time of the purchase of airlock 1, Spicecraft had one milling system known as the old Bauer Mill. In November 1981, Micron supplied defendant Bauermeister with an identical airlock with Serial No. 81632A1 (hereinafter referred to as airlock 2). Approximately at this same time, Spicecraft purchased a second milling system known as the new Bauer Mill. The purchase of the new Bauer Mill consisted of purchasing certain component parts from Bauermeister, which included airlock 2.
Both mills were capable of operation at the time of plaintiff's accident. The component parts, including the airlock, are interchangeable, and in fact were regularly interchanged. The two airlocks were the same model but with different serial numbers.
The plaintiff was injured on the new Bauer Mill. When defendant Bauermeister inspected the new Bauer Mill on May 24, 1991 (three years after the accident) it contained airlock 1. No one knows which airlock the new Bauer Mill contained when plaintiff was injured.
The Micron airlock consists of a cylindrical housing in which a rotor vane turns, slowly conveying dry material from a part of the system known as the upper chamber to another part of the system known as the lower chamber. The upper chamber, the lower chamber, and the auger are all separate component parts not designed or manufactured by Micron.
Micron sold airlock 2 to Bauermeister in accordance with Bauermeister's specifications. It did not know of the airlock's intended use and had no knowledge or participation in the design and assembly of the new Bauer Mill. Micron provided Bauermeister with a copy of the owner's manual for the airlock; which Bauermeister then provided to Spicecraft. See, Exhibit F attached to (first) affidavit of Deborah Scott. The manual describes the airlock as a simple piece of equipment designed to meet "a wide spectrum of industrial needs". Exhibit F, pgs. 1-2. It further lists "normal safety precautions" that should be taken to avoid injury to personnel. These safety precautions include:
5. To prevent loss of fingers or hands, the open discharge at the bottom of the airlock can be connected to a duct or sleeve of a minimum of 36" in length, so that an individual cannot reach the moving blades from underneath. A grid or screen can also be installed over the outlet flange.

*1515 6. Install a safety cutoff switch within arm's reach of the airlock in case of accident or emergency.
Exhibit F, pg. 3.
Defendant/third-party plaintiff Bauermeister seeks indemnity and contribution from Micron. It states that "the alleged injury to plaintiff allegedly arose out of the absence of an interlock on the rotary air lock as described in plaintiff's First Amended Complaint." Third-party Complaint, ¶ 3. Bauermeister's contends that it is entitled to indemnity or contribution from Micron based on the opinions expressed by plaintiff's expert as to the "defective" nature of the milling system. Bauermeister further contends that it did not manufacture, design or assemble the new Bauer Mill. Micron counters that it too did not manufacture, design or assemble the milling system. It argues that it is entitle to summary judgment because plaintiff's expert clearly stated (at his deposition) that the defects in the milling system were a lack of an interlock which would preclude operation of the auger whenever the airlock is opened or has been removed; and the lack of some type of warning, preferably a warning light. Micron further argues that plaintiff's expert clearly viewed the defects as defects in design of the milling system and that the designer (whom he named as defendant Bauermeister) was responsible.
In plaintiff's First Amended Complaint, he alleges:
9. That the said machine was sold, manufactured, designed, assembled and installed in a defective manner in that;
a. It lacked a warning light which would advise an operator that the auger was on;
b. It lacked an interlock system to prevent the operation of the auger when the airlock was removed;
c. It lacked an interlock system to prevent the operation of the auger when any of the components of the machine were disassembled.
Plaintiff does not allege any defect in the airlock itself but rather a defect in the overall design of the milling system in that it lacked an interlock system and a warning light.
Plaintiff's expert has clearly opined that the defects existed in the design of the milling system, not with any one component part. At his deposition, Donald Creighton (plaintiff's expert) testified that the new Bauermeister Mill was defective in that "the design is such that the rotary valve at thethe outlet of the rotary valve as designed is two feet four inches above floor level, that it is defective in that there is no written warning; further defective that there is not a warning light; further defective in that there is no interlock provided which would preclude operation of the auger on the downstream side of the rotary valve at any time that the rotary valve is open or has been removed." Creighton Deposition, pg. 12-13. He testified that a warning light should be placed "on the machine at that location that would indicate that the rotary valve and/or auger were, in fact, in operation." Creighton Deposition, pg. 14. He further testified that the written warning should "be at the location adjacent to the rotary valve and/or the auger itself." Creighton Deposition, pg. 15. As for the interlock, Creighton testified that "... I don't have a design, but it's a pretty simple and straightforward thing. You interlock it so that if this plate is opened up or if the valve itself is removed, that the circuit is interrupted and the brake applied on the drive systems of the rotary valve and the auger." Creighton Deposition, pgs. 16-17. When asked as to whether he had an opinion about whether or not the airlock should come with an interlock, Mr. Creighton replied "I don't really. I really don't have an opinion on that. But it may be that there areyou know, that valve itself isn't theyou can't reallyyou're not going to just use that valve like that. It's incorporated into a system. That's the point at which the interlocking would occur." Creighton Deposition, pg. 28. He further stated that "[r]ight off, my opinion would beyou knowI've already indicated that the responsibility for that would be the responsibility of the designer here." Creighton *1516 Deposition, pg. 28. He also pointed out that an interlock cannot be effectively designed into a component part without knowing first how that component part is going to be integrated into a system. Creighton Deposition, pg. 28. Finally, he specifically noted that whoever put the system together was responsible for putting on the interlock and that as far as he knew, the designer of the milling system in question was defendant Bauermeister. Creighton Deposition, pg. 21.
Nowhere in the submitted deposition testimony of plaintiff's expert does he opine that the Micron airlock was defective in any way. He specifically testified, several times, that the milling system was defectively designed because it lacked a warning (written and/or a light) and an interlock. Defendant/third-party plaintiff Bauermeister offers no expert testimony in rebuttal.
Based upon the affidavits and deposition testimony submitted, the Court finds that the Micron airlock was not defective.
The courts in jurisdictions outside of Missouri have held that the manufacturer of a non-defective component part is not liable for incorporation into a final product which has been defectively designed. Childress v. Gresen, 888 F.2d 45, 48-49 (6th Cir. 1989), aff'g 690 F.Supp. 587, 591-92 (E.D.Mich.1988); Koonce v. Quaker Safety Products and Manufacturing, 798 F.2d 700, 715 (5th Cir.1986); Feuerverger v. Hobart Corp., 738 F.Supp. 76, 78 (E.D.N.Y. 1990); Cropper v. Rego Distribution Center, 542 F.Supp. 1142, 1156 (D.Del.1982).
Although Missouri has not addressed this issue directly, it has embraced certain theories of product liability which leads this Court to opine that the Missouri courts would agree with the majority of jurisdictions that hold a non-defective component part manufacturer should not be held liable for the incorporation of the part into a defectively designed product.
Under Missouri products liability law, a plaintiff has available three theories of recovery: strict liability, negligence, and breach of warranty. Linegar v. Armour of America, 909 F.2d 1150, 1152-3 (8th Cir.1990). The theory of strict liability is further broken down into liability for defective design and liability for failure to warn of an inherent danger in the product. These two theories have now been codified pursuant to § 537.760 R.S.Mo. Linegar, at 1152. Under the Missouri law of strict liability in tort for defective design, in order to establish liability of the seller or manufacturer, a plaintiff must demonstrate that 1) the product was defective and dangerous when put to a use reasonably anticipated by the manufacturer and 2) the plaintiff sustained injury or damage as a direct result of the defect. Lewis v. Envirotech Corp., 674 S.W.2d 105, 110 (Mo.App.1984). The plaintiff has the burden to show the defect existed when the product left the control of the manufacturer and entered the stream of commerce. Lewis, at 110. Consequently, a supplier is not liable when it delivers a product in a safe condition but subsequent mishandling renders the product defective. Donahue v. Phillips Petro., 866 F.2d 1008, 1010 (8th Cir.1989) citing Porter v. C.A. Dawson & Co., 703 F.2d 290 (8th Cir.1983) and Williams v. Ford Motor Co., 494 S.W.2d 678 (Mo.App.1973). Nor is a seller strictly liable for injury caused by a defect created by a third-party. Winters v. Sears, Roebuck, & Co., 554 S.W.2d 565 (Mo.App.1977).
In 1983, the Missouri Court of Appeals first broached the question of component parts manufacturer liability. In Chubb Group of Ins. v. C.F. Murphy & Associates, 656 S.W.2d 766 (Mo.App.1983), the Court considered the liability of the architects, contractors and manufacturers of component parts used in roof supports in a case arising from the collapse of the roof of the Kemper Arena (in Kansas City, Missouri). The Court held that the plaintiffs had no cause of action for products liability against the architect and the contractor but could possibly maintain one against the manufacturers of the steel beams and bolts used in the roof. The Court was unclear as to the role that these parties played in the disaster but stated that (if Kansas City Structural Steel did provide the beams and welded them into the roof) "... we have no difficulty finding that those beams, if defective, *1517 may have been products within the meaning of sec. 402A. The same is true of bolts provided by Bethlehem Steel." Chubb, at 781.
In Lewis v. Envirotech Corp., supra, the Missouri Court of Appeals considered a defective design/failure to warn strict liability case against a defendant component manufacturer of an allegedly defective check valve on a pump (one of three pumps utilized by a power plant). The Court found that the plaintiff made a submissible case for the jury by establishing that the Flex Check Valve was used in a manner reasonably anticipated. Defendants had contended that the Flex Check Valve should not have been used except in conjunction with an isolation valve. Lewis, at 111. The plaintiff successfully established that the Flex Check Valve had been used in a slurry pumping system; a use specifically advertised by the defendants. Furthermore, the defendants' advertising and promotional materials make no mention of the need to use an isolation valve with the Flex Check Valve. Lewis, at 111. The Court stated that "[w]e have not found and defendants have not cited us to case law supporting their proposition that alterations to other components of a system of which the product in question is a component bars liability for a defect in the product itself." Lewis, at 111.
In 1984, the Missouri Court of Appeals considered a products liability case raising similar issues as the ones in the present case. In Hunt v. Guarantee Electric Co. of St. Louis, 667 S.W.2d 9 (Mo.App.1984), the plaintiffs alleged a defect in the design of the electrical system that controlled the agitator in the mix tank. The defect alleged concerned the overall design of the control panel following installation of the timer. Plaintiffs aver that the electrical system was defective insofar as it lacked a warning light indicating that the timer was set in the automatic position. Hunt, at 11. The defendant in the Hunt case had contracted with the decedent's employer to provide electrical workers at the plant, furnish replacement materials and supplies, and supervise and direct an electrical engineering force. At the time of the accident, a timer was intergrated into the existing electrical control panel. Its purpose was to activate the agitator inside the mix tank for three minutes at a time with twelve minute intervals between agitations. The decedent had entered the mix tank to clean it manually. Evidently the timer was set in the automatic position and the master switch remained on. This was not apparent to anyone, especially the decedent.
The plaintiffs did not allege that the timer itself was defective. There was no evidence that the defendant manufactured, sold, furnished, or supplied the component parts of the timer its employees installed. Defendant had installed the timer pursuant to a contract with the decedent's employer to provide the services of electricians. The defendant had no connection to the design, furnishing, and installation of the electrical system for automatic agitation of the mix tank. Defendant was held not liable. Hunt, at 12.
After reviewing the relevant Missouri caselaw, this Court believes that the Missouri courts would reject the notion of holding a component part manufacturer liable for the defective integration of its non-defective component part. To hold a component part manufacturer liable in such a situation would "cast it in the role of insurer". Linegar, at 1155 (rejection of a strict liability claim against the manufacturer of a non-defective bulletproof vest; decedent died from gunshot wounds in areas not covered by the vest). This Court believes that the Missouri courts would follow the lead of the Michigan courts.
"Indeed, extending the duty to make a product safe to the manufacturer of a non-defective component part would be tantamount to charging a component part manufacturer with knowledge that is superior to that of the completed product manufacturer ... [t]he court in Jordan v. Whiting Corp., supra [49 Mich. App. 481, 212 N.W.2d 324 (1973)], stated `The obligation that generates the duty to avoid injury to another which is reasonably foreseeable does notat least yetextend to the anticipation of how manufactured components not in and of *1518 themselves dangerous or defective can become potentially dangerous dependent upon the nature of their integration into a unit designed, assembled, installed, and sold by another.'" Jordan, supra, 49 Mich.App. at 486, 212 N.W.2d at 328.
In the present case, the plaintiff does not allege in any way that the Micron airlock was defective. Third-party defendant Micron Powder Systems sold the airlocks to Spicecraft and Bauermeister without knowledge of the intended use. The literature regarding the Micron airlock states that it is usable in a variety of machinery. It goes on to suggest certain safety precautions depending on the ultimate use of the airlock. Plaintiff's expert found no fault with the design of the airlock, rather he specifically found fault with the overall design of the milling system in that it lacked some type of warning and an interlock. Bauermeister has failed to present any expert evidence to contradict plaintiff's expert's deposition testimony. Instead, Bauermeister appears to simply want to shift the blame to Micron because Bauermeister claims that it did not design the milling system. Its only factual support for the blame-shifting is the discovery, three years after the fact, that the airlock in the new Bauer Mill was not the airlock Micron originally sold to Bauermeister. Since both airlocks were the same model, just different serial numbers, Bauermeister has failed to show the Court any material fact in issue. Furthermore, since this Court finds, as a matter of fact, that the airlock was not defective, and as a matter of law, that Micron can not be held liable for the incorporation of its non-defective component part into a milling system defectively designed, Micron's summary judgment motion must be granted. Whether or not Bauermeister designed, furnished, and installed the new Bauer Mill system is an issue to be resolved (later) independent of issues raised in Micron's summary judgment motion.