**Patricia Elaine MILLER and Kyle W. Miller, Plaintiffs,**

v.

**E.I. DuPONT de NEMOURS AND COMPANY, Defendant.**

**No. CIV 3–91–0445 (Jury).**

United States District Court, E.D. Tennessee, at Knoxville.

Sept. 30, 1992.

William R. Banks, T. Scott Jones, Knoxville, TN, for plaintiffs.

Dan D. Rhea, Thomas S. Scott, Jr., Arnett, Draper & Hagood, Knoxville, TN, Barry Fish, Stephen Bressler, Richard Weare, Lewis and Roca, Phoenix, AZ, for defendant.

### MEMORANDUM OPINION

JORDAN, District Judge.

This case is presently before the Court on the plaintiffs' motion for reconsideration and/or objection [doc. 10] to the Report and Recommendation ("R & R") [doc. 9] filed on May 12, 1992, by the Honorable Robert P. Murrian, United States Magistrate Judge.

The defendant filed its motion for summary judgment [doc. 7] on March 16, 1992. The plaintiffs did not respond to this mo-

tion before Magistrate Judge Murrian filed his R & R. *See* L.R. 7.1, E.D.Tenn. "Failure to respond to a motion may be deemed a waiver of any opposition to the relief sought." L.R. 7.2, E.D.Tenn. The plaintiffs did object to the R & R in a timely manner.

 In his R & R, Magistrate Judge Murrian recommended that the defendant's motion for summary judgment be granted. The Court has carefully reviewed the R & R, and the plaintiffs' objection. For the reasons that follow, the R & R will be ACCEPTED IN WHOLE. 28 U.S.C. § 636(b)(1).

This is a products liability action in which the plaintiff Patricia Elaine Miller allegedly was injured by a temporomandibular joint implant containing a substance, known as Proplast. The plaintiffs allege that Proplast "was manufactured, processed, placed in the market place, sold, promoted, supplied, distributed, and/or designed by the defendant in this action." The plaintiffs further allege that the defendant Du-Pont knew or should have known that Proplast was a dangerous substance, and that as a direct result of the defendant's negligence, the plaintiff Patricia Elaine Miller was severely injured. Additionally, the plaintiffs allege that the defendant breached an implied warranty, and should be held strictly liable for manufacturing and marketing an unreasonably dangerous product.

In its motion for summary judgment, the defendant says that the plaintiffs sued the wrong defendant, and that the defendant did not manufacture or sell any substance known as Proplast, but merely supplied polytetrafluoroethylene (PTFE) fibers to the manufacturer of Proplast. The defendant says further that PTFE fibers and resins have been used in a variety of products such as non-stick frying pans, valve parts, tubing, wiring, and electrical parts, since the early 1960s. DuPont says that it was merely a raw material supplier for Vitek, Inc., and that Vitek, using its own patented procedures, manufactured and marketed the substance known as Proplast.

A motion for summary judgment "shall be rendered forthwith if the pleadings, de-positions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court will review the facts drawing all inferences in favor of the non-moving party. *White v. Turfway Park Racing Association, Inc.*, 909 F.2d 941, 943 (6th Cir.1990) (citation omitted). Once a party presents evidence sufficient to support a Rule 56 motion, the opposing party cannot rely upon mere allegations contained in the pleadings. Rather, the opposing party must come forward with some significant probative evidence that necessitates the resolution of a factual dispute. *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987) (citation omitted). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original).

In opposition to the defendant's motion, the plaintiffs have filed the affidavit of Dr. Donald C. Chase, an oral and maxillofacial surgeon. Dr. Chase opines that the plaintiff Ms. Miller's injuries are "directly attributable to the use of the teflon component of the implant." Vitek selected PTFE as a raw material in making Proplast. The plaintiffs have not provided any evidence tending to show that the PTFE fibers and resins the defendant supplied to Vitek were in any manner defective or unsafe.

The plaintiffs assert that the defendant entered into a "joint venture" with Vitek to manufacture Proplast, but fail to support that assertion with any evidence other than order forms showing the defendant's shipment of bulk PTFE fibers to Vitek. Accordingly, the Court finds that a "joint venture" did not exist between the defendant and Vitek.

The plaintiffs next assert that "to plaintiffs' knowledge all courts that have considered this question, and particularly the Federal Courts, have overruled this summary judgment motion and have ruled in the plaintiff's favor on this question."

They further assert that the defendant's position is not the "tact" followed by the other courts which have considered this question. However, the plaintiffs are either unwilling or unable to cite to this Court any legal authority in support of these assertions. The plaintiffs do cite T.C.A. § 29–28–102(4), which defines manufacturer as "the designer, fabricator, producer, compounder, processor, or assembler of any product or its component parts." The plaintiffs also cite the Restatement of Torts (2d) § 395 in support of their position.

The Restatement provides:

Negligent Manufacture of Chattel Dangerous unless Carefully Made

A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied.

The plaintiffs' reliance on § 395 is misplaced. The plaintiffs fail to provide any evidence that the defendant negligently manufactured the PTFE supplied to Vitek. Moreover, there is no proof the PTFE was a defective "component part" of the allegedly defective Proplast manufactured by Vitek.

The plaintiffs also rely on *S.S. Co. v. Stone Manganese Marine, Ltd.*, 371 F.Supp. 500 (D.N.J.1973). In that case, a supplier of alloy ingots for a manufactured marine propeller was denied summary judgment because evidence existed that the alloy supplied was defective. In the present case, however, the plaintiffs have not shown that the PTFE fibers supplied by DuPont were in any manner defective.

The plaintiffs cite *Hurt v. Coyne Cylinder Company*, 956 F.2d 1319 (6th Cir. 1992), for the proposition that "whether [a] warning is adequate is usually a question

for [the] jury...." However, the plaintiffs fail to complete the quotation, which continues "... unless reasonable minds could not disagree on the outcome." *Hurt* was a design defect products liability case arising from the explosion of an acetylene cylinder. The court of appeals, relying on *Goins v. Clorox Co.*, 926 F.2d 559 (6th Cir.1991), and *Browder v. Pettigrew*, 541 S.W.2d 402, 405 (Tenn.1976), stated:

"In reviewing Tennessee law on the subject of adequate warnings, the *Goins* court stated that a two-part test existed in Tennessee law: 1) the plaintiff must establish the product is unreasonably dangerous by reason of defective warning and 2) the plaintiff must prove that the inadequate labelling proximately caused the claimed injury."

*Hurt, supra*, 956 F.2d at 1329. The court of appeals further stated that "[i]f either part is not met, the plaintiff fails to meet its burden." *Id.* at 1329. The plaintiffs have not even alleged, much less pointed to anything in the record that suggests, that the defendant failed to label adequately the PTFE fibers supplied to Vitek.

The defendant's motion for summary judgment was referred to United States Magistrate Judge Murrian by Order of this Court under 28 U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b), which require the Court to review *de novo* those findings of the magistrate judge's report and recommendation to which the parties object. "The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate with instructions." Fed. R.Civ.P. 72(b). Under *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 585–88, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986), in order to defeat the defendant's motion for summary judgment, the plaintiffs must show a genuine issue for trial. Evidence, not argument, must be produced in order to satisfy this burden. *Anderson v. Liberty Lobby, Inc., supra.*

This Court is presented with a dearth of evidence which could provide some legal principle on which the defendant in this

case could be held liable for the injuries allegedly suffered by the plaintiff Ms. Miller. Accordingly, under the facts of this case, Magistrate Judge Murrian's Report and Recommendation will be accepted in whole by this Court, and the plaintiffs' claim will be dismissed.

## APPENDIX

### REPORT AND RECOMMENDATION

MURRIAN, United States Magistrate Judge.

This case is before the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b), Federal Rules of Civil Procedure, for a report and recommendation regarding disposition by the District Court of the defendant's motion for summary judgment [Docs. 7 and 8].

This is a products liability action wherein the plaintiff, Patricia Elaine Miller, alleges that she was injured as a result of a temporomandibular joint prosthesis known variously as " 'Proplast[®] TMJ, Interpositional Implant', 'Proplast[®]', 'Proplast[®] I', 'Proplast[®] II' " (hereinafter referred to as "Proplast®"), see Doc. 1, Complaint attached thereto, being implanted in her body. Specifically, plaintiffs contend that the Proplast® which was implanted in the body of plaintiff, Patricia Elaine Miller, was manufactured, processed, placed in the marketplace, sold, promoted, supplied, distributed, and/or designed by the defendant, E.I. DuPont de Nemours ("DuPont"); that defendant knew or should have known that the Proplast® was a dangerous and potentially injurious product when it was implanted into the bodies of individuals; that despite this, defendant failed to warn or give any notice of the harmful nature of the Proplast®; that the injuries to plaintiff, Patricia Elaine Miller, were a direct result of the negligence of the defendant; that as a direct consequence of defendant's negligence plaintiff suffered severe and continuing painful and disabling injuries resulting in great pain and continued expense to the plaintiff; and that as a consequence of the injuries to Patricia Elaine Miller, her husband, Kyle W. Miller, was deprived of her valuable services, society, and consortium [Doc. 1]. Plaintiffs further allege that the defendant is guilty of breach of implied warranty and that the defendant is strictly liable for the marketing and introduction of a defective and inherently dangerous product which caused serious irreparable pain, suffering, and injury to the female plaintiff in this action.

The defendant moves the court for an order entering summary judgment in its favor, contending that defendant did not manufacture or sell any device known as a "Proplast[®] TMJ Implant" or any similar device; that defendant merely provided a raw material to the manufacturer of the Proplast® TMJ Implant; that defendant had no direct relationship, other than as a supplier of materials, to the manufacturer of the Proplast® TMJ Implant; that the Proplast® TMJ Implant was a medical device specifically governed, regulated and approved by the federal Food and Drug Administration; that there is no dispute as to these material facts; and that, therefore, defendant is entitled to judgment as a matter of law [Doc. 7]. In support of its motion, defendant relies upon the affidavit of John S. Lindell, the Product Manager for Teflon® homopolymers/monomers in the Specialty Polymers division of DuPont Polymers of DuPont, wherein he states that he has a Bachelors Degree and a Masters Degree in Chemical Engineering from Cornell University; that he has been employed with DuPont since 1966; that he has been employed with DuPont in various capacities working with Teflon® polytetrafluoroethylene ("PTFE") products since 1977; that he is not personally familiar with every application of PTFE, but that he can verify from personal knowledge the applications described herein as being typical of applications for various products made with PTFE; that PTFE is the generic chemical name for a type of fluoropolymer; that several manufacturers other than DuPont make and sell PTFE raw materials; that DuPont's PTFE resins, powders and fibers are sold by DuPont under the trademark Teflon®; that PTFE became best known to the public in 1961 when non-stick frying pans, made with Teflon® PTFE,

were introduced in the United States; that a historical list of some applications demonstrating the wide variety of products and materials made with, or containing PTFE as one of the raw ingredients, which have been created by sophisticated manufacturing companies over the past 52 years includes (a) bearing pads which support decorative facades on the exterior of Canada's fifty-six story, twin towered Toronto–Dominion Center; (b) seals used in the transmissions of Ford automobiles; (c) parts in valves; (d) quartz crystals for use in electronics; (e) tubing to protect wiring; (f) piston rings for use in Navy submarines; (g) self-lubricating ball bearings used in spacecraft and satellites; (h) jet aircraft carry hook-up wire and electronic wire insulated with PTFE; (i) the Vanguard I satellite used antenna insulators made with PTFE; (j) electrical parts in the airborne radar fire control system in the F–4 Phantom Jet; and (k) bearings in the Steinway piano; that PTFE is sold in the form of different types of raw material such as resin, powder, or fiber; that in all its forms, DuPont sells a large quantity of PTFE to a large number of different customers; that in any given year DuPont sells several million pounds of PTFE materials to several hundred different manufacturers of PTFE; that DuPont has records showing that Vitek, Inc. ("Vitek") purchased PTFE resin and powder from DuPont's Polymer Products Department at various times; that DuPont also has records showing that Vitek purchased PTFE fibers from DuPont's Textile Fibers Department at various times; that DuPont's sales to Vitek were made in bulk form; that PTFE resin and powder are sold in 50, 100, and 200 pound containers; that Vitek is a separate corporation with no relationship to DuPont except Vitek's purchase of bulk raw materials for use in Vitek's products; that DuPont did not participate in any way in the design, manufacture or sale of Vitek's products; that DuPont has not been engaged in any licensing agreement, joint venture or partnership with Vitek; that Exhibit 1 attached to his affidavit is a true and correct copy of a letter from J.B.

Armitage to Mr. John W. Tellkamp, dated May 13, 1977, along with an attachment entitled "Statement of Policy Regarding Medical or Surgical Uses of Plastic Materials", retained in DuPont's business records and kept in the normal course of DuPont's business activities; and that Exhibit 2 attached to his affidavit is a true and correct copy of the signature page returned and signed by Dr. Charles Homsy as President of Vitek, retained in DuPont's business records and kept in the normal course of DuPont's business activities [Doc. 7, Lindell Affidavit attached thereto].

In the letter dated May 13, 1977, from J.B. Armitage with the Patents and Regulatory Affairs Division of DuPont, to Mr. John W. Tellkamp, Director of Manufacturing with Vitek, Mr. Armitage states the following:

> As I am sure your company is already aware, Teflon® fluorocarbon resins are made for industrial purposes only, and we market no medical or surgical grades. A statement of policy on this position is enclosed.

[Doc. 7, Exhibit 1 attached to Lindell affidavit]. Attached to the aforementioned letter is a "Statement of Policy Regarding Medical or Surgical Uses of Plastic Materials" which states, *inter alia,* that

> [t]he following is a statement of the conditions under which the Fluorocarbons Division of the Plastic Products and Resins Department can supply either experimental or commercial quantities of its resins for medical or surgical purposes. By signing and returning to us a copy of this statement, persons contemplating such uses must understand and accept these conditions and must assure us that the applicable legal requirements are being met before any shipments can be made or any technical help extended with respect to such uses.
>
> Du Pont Teflon® fluorocarbon resins and Tefzel® fluoropolyme[rs] are made for industrial purposes only. We conduct such tests as are needed to protect the ordinary users of these products but do not perform the detailed, long-term studies which should be made before

they are used for medical or surgical purposes. We make no medical or surgical grades and have not sought or received any rulings from the Federal Food and Drug Administration or from any governmental agency as to the safety or effectiveness of these products for such purposes.

Persons proposing to evaluate or to use these products for medical or surgical purposes must rely on their own medical and legal judgment without any representation on our part. They must accept full responsibility for all consequences, either direct or indirect. Any data or other information from Du Pont is supplied in good faith but its applicability in any particular situation must be determined by the recipient.

It must further be understood that there is no guarantee of a constant composition with these resins. Our products are produced to within narrow specifications, but deliberate changes in formulation may occur and tests run at one time may not be adequate proofs of safety or suitability at some later date.

*Id.* Also attached to Mr. Lindell's affidavit is the signature page of the above quoted statement signed by Dr. Charles Homsy as President of Vitek dated May 16, 1977 [*id.*, Exhibit 2].

The defendant contends that Proplast® is a registered trademark of Vitek, Inc. for a porous compound made with PTFE resins and fibers, carbon fibers, and other ingredients fabricated by a Vitek-patented process; that Vitek designed and manufactured the Proplast® device that allegedly injured the plaintiff; that Vitek evaluated the safety of its Proplast® TMJ Implant, tested the components of the device in animals and humans, and sold the product to oral surgeons and other licensed physicians; that the Proplast® TMJ Implant was made available for such use only after Vitek was authorized to sell its product by the U.S. Food and Drug Administration; that DuPont sold industrial polymer raw materials such as PTFE powder to Vitek in bulk form that Vitek apparently used as an ingredient in formulating the Proplast® TMJ Implant; that PTFE is a plastic raw material made by many raw material manufacturers and used by their customers in a wide variety of industries; that DuPont never made any representation to Vitek that its PTFE was an appropriate material for use in Vitek's products; that, rather, DuPont advised all medical companies including Vitek that DuPont's polymers were not made for medical use; that DuPont sold raw materials to Vitek only upon the condition that Vitek take full responsibility for the safe use of DuPont's raw material; that all of the plaintiffs' claims are based upon the mistaken factual premise that DuPont designed, manufactured, and sold the Proplast® TMJ Implant; that DuPont in fact had no such role; that DuPont has no legal responsibility to assure that Vitek's specialized medical use of the raw material provided to Vitek was safe; that, as a matter of law, liability for defects in a medical device is imposed on the medical device manufacturer and the FDA; that the law does not impose this duty on raw materials suppliers; and that it is entitled to judgment as a matter of law in this case [Doc. 7A].

The plaintiffs have not responded to the defendant's motion within the time allowed by Local Rule 7.1, EDTN. Accordingly, the undisputed facts are that the defendant did not manufacture or sell the device about which the plaintiffs complain; that, Proplast® is a registered trademark of Vitek, Inc. for a porous compound made with PTFE resins and fibers, carbon fibers, and other ingredients fabricated by a Vitek-patented process; that Vitek, Inc., apparently manufactured and sold the Proplast® at issue; that DuPont has no direct relationship with Vitek; that DuPont merely sold Vitek a raw material (PTFE) used to manufacture the Proplast®; that plaintiffs have not alleged any defect in the PTFE sold by DuPont to Vitek and used in the manufacture of the Proplast®; that there is no evidence that PTFE in and of itself is dangerous or defective; that DuPont advised Vitek that its fluorocarbon resins were made for industrial purposes only and that it did not market any medical or surgi-

cal grades of PTFE; and that DuPont further advised Vitek that DuPont only conducted tests needed to protect against ordinary industrial uses, and that anyone who proposed to use its fluorocarbon resins for medical or surgical purposes must rely on their own medical and legal judgment.

Whether there is a duty owed by one person or entity to another is a question of law for the court. *Dooley v. Everett*, 805 S.W.2d 380, 384 (Tenn.App.1990). My research has not found, and the plaintiffs have not cited me to, any Tennessee case law which holds that the supplier of a non-defective raw material which serves as one ingredient in a manufactured product, owes any duty to the ultimate consumer of the manufactured product. In fact, I have not found any Tennessee case directly on point with the facts of this case. Courts in jurisdictions outside of Tennessee have, however, held that the supplier of a raw chemical/material used in the manufacture of other products, or similarly, that a manufacturer of a non-defective component part is not liable for the incorporation of the raw chemical/material or component part into a final product which has been defectively designed. *Sperry v. Bauermeister*, 786 F.Supp. 1512 (E.D.Mo.1992) (citing *Childress v. Gresen*, 888 F.2d 45, 48–49 (6th Cir.1989), *aff'g* 690 F.Supp. 587, 591–92 (E.D.Mich.1988); *Koonce v. Quaker Safety Products and Manufacturing*, 798 F.2d 700, 715 (5th Cir.1986); *Feuerverger v. Hobart Corp.*, 738 F.Supp. 76, 78 (E.D.N.Y.1990); *Cropper v. Rego Distribution Center*, 542 F.Supp. 1142, 1156 (D.Del. 1982)). In *Sperry, supra*, the court quoted the following statement from the Michigan appellate court:

"Indeed, extending the duty to make a product safe to the manufacturer of a non-defective component part would be tantamount to charging a component part manufacturer with knowledge that is superior to that of the completed product manufacturer ... the court in *Jordan v. Whiting Corp.*, [49 Mich.App. 481, 212 N.W.2d 324 (1973), *rev'd in part on other grounds*, 396 Mich. 145, 240 N.W.2d 468 (1976)], stated 'The obligation that generates the duty to avoid injury to another which is reasonably foreseeable does not—at least yet—extend to the anticipation of how manufactured components not in and of themselves dangerous or defective can become potentially dangerous dependent upon the nature of their integration into a unit designed, assembled, installed, and sold by another.' *Jordan, supra*, 49 Mich.App. at 486, 212 N.W.2d at 328."

*Sperry, supra.* See also *Childress v. Gresen Manufacturing Co.*, 888 F.2d 45, 49 (6th Cir.1989) (quoting the same statement from *Jordan v. Whiting Corp., supra*, in a case applying Michigan law). Similarly, in *Koonce v. Quaker Safety Products and Manufacturing Company*, 798 F.2d 700 (5th Cir.1986), the court held that "[t]he component part manufacturer is protected from liability when the defective condition results from the integration of the part into another product and the component part is free from defect." *Id.*, at 715 (applying Texas law).

It has been held in Pennsylvania that a bulk supplier of chemicals used in the making of prescription drugs has no duty to warn a plaintiff, a plaintiff's doctors, or the manufacturer of the administered prescription drug of the allergic reaction that certain patients may have to a particular drug. *White v. Weiner*, 386 Pa.Super. 111, 562 A.2d 378 (1989), *aff'd*, 525 Pa. 572, 583 A.2d 789 (1991). Similarly, in *George v. Parke–Davis*, 107 Wash.2d 584, 733 P.2d 507 (1987), the Washington Supreme Court was presented with the question of whether "a bulk supplier of raw diethylstilbestrol [("DES")] is liable in a product liability action for indemnification and/or contribution to a tableter of DES, i.e., a pharmaceutical company which processes the raw DES by adding various binders and other inert ingredients, makes tablets of various dosages, and packages the DES with its own directions and warnings, assuming that said tableter is found liable to a plaintiff for injuries sustained in utero by a fetus whose mother ingested the DES sold to the tableter by the bulk supplier?" The Washington Supreme Court held that in

light of the fact that DES is not inherently harmful; that it is still prescribed for ailments not associated with pregnancy; that it is the way in which DES is used, and not DES per se, which is harmful; and that the Federal Food and Drug Administration requires tablet manufacturers and not the bulk manufacturers to account for and warn of a drug's properties, 21 U.S.C. § 355, it would be anomalous to require the raw manufacturer to conduct separate tests to determine the adverse effects of the drug.

■ The precise question before this court is whether the supplier of a non-defective raw material used in the manufacture of a medical device which has allegedly been defectively designed and/or manufactured, is liable to a consumer who is allegedly injured by the defective device? As previously indicated, the plaintiffs have failed to cite any authority for holding the defendant in this case liable. The defendant cites *Kellar v. Inductotherm Corp.*, 498 F.Supp. 172 (E.D.Tenn.1978), *aff'd*, 633 F.2d 216 (6th Cir.1980), as support for the proposition that, if presented with the question now before this court, the Tennessee courts would follow the reasoning and holdings of the other jurisdictions cited herein. *Kellar, supra*, was a products liability action involving the following undisputed facts:

In 1971, [the] defendant sold a channel furnace to Vestal Manufacturing Company, ("Vestal"), plaintiff's employer. Vestal then installed the furnace at its foundry. Defendant was aware of Vestal's plans for installation. Defendant also sold to Vestal a rear deck which was intended to be attached to the furnace, and which was attached by Vestal. In 1974, the furnace was moved 15 feet from its original point of installation. The operation of the furnace was essentially unaffected by the change in location.

Plaintiff, James D. Kellar, was working as a furnace helper at Vestal at the time of the accident. Plaintiff was working at a nearby furnace when an eruption occurred. The jury could reasonably have concluded from the evidence that a piece of scrap metal struck plaintiff in the head, causing him to be dazed. The jury could also have found that, in this condition, plaintiff moved a short distance and fell into the open pit of the channel furnace manufactured by the defendant.

*Kellar*, 498 F.Supp. at 173–174. The evidence further demonstrated that the furnace manufactured by the defendant could be used without exterior surrounding platforms; that most of the time channel furnaces were installed into pits, or open areas, with work platforms built up around the furnace; that when the furnace pours out metal it tilts forward, exposing the pit; that Vestal built work platforms surrounding the furnace which created the pit into which the plaintiff fell; that the rear deck which Vestal ordered from the defendant covered all of the pit when the furnace was in a horizontal position; but that when the furnace was in a tilted position, the rear deck did not cover a small open space into which the plaintiff fell; and that although Vestal provided chains to guard the open space of the pit, the chains were not normally used and were not in use on the day of the accident. *Kellar*, 498 F.Supp. at 174. The plaintiffs alleged, *inter alia*, that the channel furnace manufactured by the defendant was defective or unreasonably dangerous because there was no guard for the open space of the pit. A jury returned a verdict in favor of the plaintiff. On a motion for judgment notwithstanding the verdict, the trial court noted that under Tennessee law a manufacturer could be held liable only if his product is in some way defective and causes harm; that the furnace at issue "served as but one small component of a larger foundry system designed and built by Vestal"; that there was no allegation by the plaintiffs that the furnace itself was in any way defective concerning its own function; that the dangerous condition of the open pit was created by Vestal and not by the defendant; and that although "[t]he manufacturer of a component part certainly may be held liable for a defect in its product, even after that part is assembled into a larger product[,]

(citations omitted) ..., the defect must be present in the 'self contained component part' itself (citations omitted)." In light of these facts the court held that the defendant's furnace could not be held defective in and of itself merely because it failed to protect plaintiff against Vestal's design and construction. *Kellar*, 498 F.Supp. at 175.

The PTFE supplied by DuPont and used as a chemical in the composition of the medical device at issue is analogous to a "component part"; thus, the component part analysis relied upon by the *Kellar* court, as well as the analysis of the Michigan court set forth in *Sperry, supra;* and *Childress, supra,* seem equally applicable to the case *sub judice.* In this case, just as in *Kellar*, there is absolutely no evidence, and the plaintiffs do not allege, that the raw material/component part, PTFE, supplied by DuPont to Vitek was defective or unreasonably dangerous when it left DuPont. Additionally, the PTFE "served as but one small component of a [completed device] designed and built by [Vitek]", *Kellar*, 498 F.Supp. at 175, and, just as the dangerous condition of the furnace in *Kellar, supra,* was created by Vestal, the allegedly dangerous condition of the device at issue, if there is such a condition, was created by the manufacturer of the device, not by the defendant. In other words, defendant's product/material/component part, in itself free from defect, was integrated with other products/materials/component parts and it was this integration, performed by the manufacturer, which resulted in an allegedly defective product. *See Koonce,* 798 F.2d at 715. Thus, in light of *Kellar, supra,* it is my opinion that under Tennessee, as well as Michigan, law " '[t]he obligation that generates the duty to avoid injury to another which is reasonably foreseeable does not ... extend to the anticipation of how manufactured components[/materials] not in and of themselves dangerous or defective can become poten-

tially dangerous dependent upon the nature of their integration into a unit[/device] designed, assembled, installed, and sold by another[,]' *Jordan, supra,* 49 Mich.App. at 486, 212 N.W.2d at 328," *Sperry, supra;* and that the Tennessee courts would not hold DuPont liable for an allegedly defective product manufactured by Vitek or some other medical device manufacturer simply because it provided a non-defective raw material, which was combined with other materials to make the ultimate device about which plaintiffs complain.

Accordingly, for the reasons indicated, it is hereby RECOMMENDED that the defendant's motion for summary judgment be GRANTED; and that the plaintiffs take nothing on their claims.[1]

---

1. Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the require- ments of Rule 72(b), Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).