McCarthur **DAVIS**, Plaintiff,

v.

**KOMATSU AMERICA INDUSTRIES CORP., Komatsu Mexicana, L.A. De C.V. a subsidiary of Komatsu Ltd., ORII Corp. of America, and ORII Corp., Defendants.**

**No. 97–2753 M1/A.**

United States District Court,
W.D. Tennessee,
Western Division.

April 16, 1999.

E. Dean White, III, Farris Mathews Branan & Hellen, Memphis, TN, for Mc-Arthur Davis, plaintiff.

Lee L. Piovarcy, Martin Tate Morrow & Marston, Memphis, TN, Shea Sisk Wellford, Martin, Tate, Morrow & Marston, P.C., Memphis, TN, for Komatsu American Industry Corp., defendant.

Mark S. Norris, Lucian T. Pera, Timothy R. Johnson, Daniel Warren Van Horn, Armstrong Allen Prewitt Gentry Johnston & Holmes, Memphis, TN, Henry T.V. Miller, McDonald Kuhn Smith Miller & Tait, Memphis, TN, for Orii Corporation of America, defendant.

Mark S. Norris, Lucian T. Pera, Timothy R. Johnson, Daniel Warren Van Horn, Armstrong Allen Prewitt Gentry Johnston & Holmes, Memphis, TN, Henry T.V. Miller, McDonald Kuhn Smith Miller & Tait, Memphis, TN, for Orii Corporation, defendant.

Lee L. Piovarcy, Martin Tate Morrow & Marston, Memphis, TN, Shea Sisk Wellford, Martin, Tate, Morrow & Marston, P.C., Memphis, TN, for Komatsu Mexicana L.A. de C.V., defendant.

Joseph M. Crout, Bowling Bowling and Associates, Memphis, TN, for Yasuda Fire and Marine Insurance Company, intervenor plaintiff.

ORDER ON DEFENDANTS KOMATSU AMERICA INDUSTRIES CORP. AND KOMATSU MEXICANA, S.A. de C.V.'S MOTION FOR SUMMARY JUDGMENT, ORDER ON DEFENDANTS' MOTION FOR LEAVE TO FILE MOTION FOR SUMMARY JUDGMENT ON ISSUE OF PUNITIVE DAMAGES, AND ORDER ON PLAINTIFF'S MOTION FOR ORAL ARGUMENT

McCALLA, District Judge.

Defendants Komatsu America Industries Corp. and Komatsu Mexicana, S.A. de C.V. (collectively "Komatsu") filed a motion for summary judgment on February 12, 1999. Plaintiff responded on March 22, 1999. The Court invited further briefing from all parties on the issue of proximate causation on April 7, 1999, which briefs were submitted by the parties on April 9, 1999. For the reasons stated below, Defendants' motion for summary judgment is GRANTED. Plaintiff's motion for oral argument on the motion for summary judgment, filed April 13, 1999, is DENIED. Defendants' motion for leave to file a motion for summary judgment on the issue of punitive damages, filed April 13, 1999, is DENIED.

## BACKGROUND

Plaintiff was injured on September 22, 1996 when he placed his left hand inside the die area of a Komatsu 200 ton press at the Memphis press plant owned and operated by Plaintiff's employer, Sharp Manufacturing Company. The press line on which Plaintiff was injured, referred to as the 200–2 line, formed metal into a part for microwave ovens.[1] Plaintiff was injured while attempting to remove a piece of scrap metal waste, or "slug," from Komatsu Press No. 4 of the 200–2 line.

The installation of the 200–2 line was completed on March 11, 1994.[2] The layout of the line was based on a drawing drafted by the engineering department of Orii Corporation per Sharp's specifications. These specifications included the number of stages, the size and weight of the blank, the type of press, and the shape of the die.

The 200–2 line was comprised of six Komatsu 200 ton presses with attached light curtains, six transfer robots, one loader/de-stacker, one unloader, two turnover robots, four intermediate tables, and conveyor belts.

---

[1] Sharp also had the 150 press line and the 200–1 press line. The 200–2 line was the third of the three lines installed at Sharp.

[2] The six Komatsu presses for the 200–2 line arrived at Sharp between February 17 and March 11, 1994, during which time they were installed by a Komatsu service technician.

The de-stacker fed sheets of metal, called "blanks," into the press line. Each press in the line stamped the blanks into various shapes and punched pre-determined holes into the blanks. The hole-punching process created slugs which occasionally got caught in the press die[3] and caused the blank to deform. The blanks were transferred from press to press by transfer robots. At the last press in the line, an automatic robot unloader removed the completely formed and punched blank from the press die area and transferred it to a conveyor belt.[4]

Each Komatsu press had a safety device known as a "light curtain" attached to its front.[5] Sharp purchased and installed these light curtains.[6] The light curtain projected an infrared beam of light from one post to another. If the beam was broken, the line would shut down.

Under the press line's layout, the robotic unloader on the last press, Press No. 4, was placed in the area protected by the light curtain. Therefore, the light curtain for Press No. 4 had to be deactivated for the press line to operate.

Each individual machine in the press line had its own control panel. Also, the line had an Orii master control panel used to control the individual machines, including the presses. Numerous buttons on the individual machines' controls panels and the master control panel would shut down the line. When the master control panel was used to start the line, an audible alarm[7] would sound and, after a short delay, the line would start.

Each press line was staffed by a press operator and an unloader. Plaintiff was assigned as an unloader on the 200–2 line.[8] One of the duties of an unloader at the time of the accident was to remove slugs in the press. When the press line was stopped, the press was in an open position. Plaintiff's understanding was that if a person entered the press to retrieve a slug while within the confines of the press' light curtain, sensors in the light curtains would stop the press from closing by preventing the line from activating.

On the morning of September 22, 1996, the day of the accident, Plaintiff was working as an unloader on the 200–2 line. The line was shut down to change over from the manufacture of one part to another. The change-over technician, Wayne Holcomb, finished the change over and ran a limited test production run of the new part to be made. Plaintiff noticed a product deformity on one of the test runs and stopped the press line by depressing the emergency stop button on the robotic unloader. After stopping the line, Plaintiff informed Holcomb of the existence of a slug. Holcomb returned to the master control panel, located between the destacker and Press No. 1. While Plaintiff was reaching into the die area to remove the slug, Holcomb restarted the line using the

3. The "die" was a tool within the press which formed and punched the blanks. Dies were exchanged to form different parts in a procedure called a "change over," which change over was performed by an employee called a "die setter."

4. The robotic unloader had an expanded metal guard on each side that was designed to protect human unloaders from any potential danger associated with the moving parts of the robotic unloader. This expanded metal guard was not intended to protect users from any danger associated with the use of any equipment to which the unloader was attached.

5. The manner in which the light curtain was installed on Press No. 4 left a thirteen-inch gap between the edge of the light curtain and the edge of the robotic unloader guard on the press.

6. Komatsu itself did not provide such point of operation guards unless specifically requested by the customer.

7. This alarm was manufactured, supplied and installed by Orii.

8. Plaintiff had no prior experience as an unloader. He received on-the-job training from the press operator and was told to ask the press operator if he had questions about the presses.

master control panel.[9] Before the line re-started, the warning buzzer sounded several times, but Plaintiff averred that he did not hear this alarm. Once the line started, Komatsu Press No. 4 stamped down on Plaintiff's left hand, injuring him.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," *id.* at 323, 106 S.Ct. 2548, and the nonmoving party is unable to make such a showing, summary judgment is appropriate. *See Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir.1989). In considering a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir.1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When confronted with a properly-supported motion for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246 (6th Cir.1998). A genuine issue of material fact exists for trial "if the evidence [presented by the nonmoving party] is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

## DISCUSSION

■ Plaintiff's product liability cause of action against Komatsu is brought under the Tennessee Products Liability Act of 1978, Tenn.Code Ann. §§ 29–28–101 to – 108. The Act provides that "[a] manufacturer or seller of a product shall not be liable for any injury to person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller." Tenn.Code Ann. § 29–28–105(a). A plaintiff may show that a product is either defective or unreasonably dangerous for liability to accrue under § 29–28–105(a). *See Roysdon v. R.J. Reynolds Tobacco Co.*, 849 F.2d 230, 235 (6th Cir.1988).

■ A defective condition is defined as "a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." Tenn.Code Ann. § 29–28–102(2). "[C]onsumer knowledge about the risks inherent in the use of a product is one factor to be considered when determining if a product is defective." *Roysdon*, 849 F.2d at 236.

An unreasonably dangerous product is "a product [that] is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or [a product that] because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller assuming that he knew of its dangerous condition." Tenn.Code Ann. § 29–28–102(8).

---

**9.** Before a press operator restarted the line, it was his duty to make visual contact with the unloader to ensure that the unloader was not in an unsafe position.

■ This definition of an unreasonably dangerous product incorporates a "consumer expectation" test and a "prudent manufacturer" test. The two tests are distinct from each other, having different elements which require different types of proof, and are neither mutually exclusive nor mutually inclusive. *See Ray v. BIC Corp.,* 925 S.W.2d 527, 531 (Tenn.1996).

■ The consumer expectation test is generally defined as whether "the product's condition poses a danger beyond that expected by an ordinary consumer with reasonable knowledge." *Id.* at 529. The prudent manufacturer test "turns on whether, balancing all the relevant factors, a prudent manufacturer would market the product despite its dangerous condition." *Id.* at 532. Considerations which are relevant under the prudent manufacturer test include: (1) the usefulness and desirability of the product to the user; (2) the safety aspects of the product, or the likelihood and probable seriousness of an injury; (3) the availability of a substitute product which would meet the same need in a safer manner; (4) the manufacturer's ability to eliminate the unsafe character of the product without impairing the product's utility or making it too expensive; (5) the user's ability to avoid danger by exercise of care; (6) the user's awareness of the danger inherent in the product; and (7) the feasibility of spreading the loss. *See id.* at 532; *Rutherford v. Polar Tank Trailer, Inc.,* 978 S.W.2d 102, 105 (Tenn.Ct.App.1998). What the buyer expects is irrelevant under the prudent manufacturer test. *See Ray,* 925 S.W.2d at 531.

■ Besides showing a defective or unreasonably dangerous condition, "a products liability plaintiff must always prove that the unreasonably dangerous or defective condition was the proximate cause of his injury." *Cansler v. Grove Mfg. Co.,* 826 F.2d 1507, 1511 (6th Cir. 1987). Proximate cause "concerns a determination of whether legal liability should be imposed where cause in fact has been established." *Snyder v. LTG Lufttech-*

*nische,* 955 S.W.2d 252, 256 n. 6 (Tenn. 1997) (noting that the establishment of cause in fact requires a showing that the harm would not have occurred "but for" defendant's conduct); *see also Caldwell v. Ford Motor Co.,* 619 S.W.2d 534, 537 (Tenn.Ct.App.1981).

■ To prove proximate cause, a plaintiff must show: (1) that the conduct complained of was a substantial factor in bringing about the harm; (2) "no rule or policy exists to relieve the wrongdoer from liability because of the manner in which the negligence resulted in the harm;" and (3) the harm could have been "foreseen or anticipated by a person of ordinary intelligence and prudence." *Brown v. Wal-Mart Stores, Inc.,* 976 F.Supp. 729, 735–36 (W.D.Tenn.1997) (citing *McClenahan v. Cooley,* 806 S.W.2d 767, 775 (Tenn.1991)). "There is no requirement that a cause, to be regarded as the proximate cause of an injury, be the sole cause, the last act, or the one nearest to the injury, provided it is a substantial factor in producing the end result." *McClenahan,* 806 S.W.2d at 775 (quotation omitted). The issue of proximate causation is one for the factfinder to determine, unless the facts and the inferences to be drawn therefrom are beyond all reasonable dispute. *See Caldwell,* 619 S.W.2d at 536.

■ An intervening act can break the chain of proximate causation. *See White v. Lawrence,* 975 S.W.2d 525, 529 (Tenn.1998). If an intervening act could not reasonably have been anticipated, then the act is a superseding cause of the harm which relieves the original wrongdoer of liability. *See id.; see also* 1 LOUIS R. FRUMER & MELVIN I. FRIEDMAN, PRODUCTS LIABILITY § 3.05 (1998). Like the issue of proximate causation, whether an act is a superseding cause is a jury issue unless the facts and reasonable inferences therefrom make it so clear that all reasonable persons must agree on the proper outcome. *See White,* 975 S.W.2d at 529.

### A. Plaintiff's Claims of Breach of Express Warranty and Misrepresentation

Plaintiff concedes that it has not established the elements supporting causes of action for breach of an express warranty or misrepresentation. Accordingly, the Court GRANTS Defendants' motion for summary judgment in these respects.

### B. Komatsu's Alleged Failure to Adequately Guard the Press

Komatsu sold to Sharp a press that had neither guards to prevent contact between the operator and the point of operation nor a warning device to warn an operator of the press that it was about to activate. A plaintiff must show that the product was in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer. "[A] product may be considered defective or unreasonably dangerous if the manufacturer failed to incorporate safety devices, which were available at the time of the product's manufacture and which would have prevented an injury resulting from the use of the product." *Cansler*, 826 F.2d at 1510 (citing *Gann v. International Harvester Co. of Canada, Ltd.*, 712 S.W.2d 100 (Tenn.1986)). However,

> A manufacturer . . . is not an insurer of the product he designs, and it is not required that the design adopted be perfect, or render the product accident proof, or incapable of causing injury, nor is it necessary to incorporate the ultimate safety features in the product. Hence, a departure from the required standard of care is not demonstrated where it is simply shown that there was a better, safer, or different design which would have averted the injury.

*Kerley v. Stanley Works*, 553 S.W.2d 80, 84 (Tenn.Ct.App.1977) (quotation omitted). Plaintiff therefore cannot simply assert that the press lacked certain safety devices to withstand motion for summary judgment. Plaintiff cannot even rely on evidence that a given safety device would have prevented the injury. Instead, Plaintiff must put forward evidence to show a defective or unreasonably dangerous condition of the press as a result of the absence of the safety devices.

In this case, Plaintiff has offered no evidence that the press was in a defective condition or unreasonably dangerous at the time it left Komatsu's control. In fact, Plaintiff's own expert, George Starr, stated: "I rather doubt that the press in and of itself, as it left the Komatsu factory, could be criticized in that manner." *See* Starr Dep. at 78.

Moreover, with respect to Komatsu's sale of the press absent point of operation guards, their absence is not a proximate cause of the accident. Sharp installed a light curtain at the front end of the press and Plaintiff was within its confines when he was injured. It therefore cannot be said that but for Komatsu's failure to install the light curtain, the accident would not have occurred. Had Komatsu installed the light curtain instead of Sharp, Plaintiff would still have sustained his injuries.

In addition, Plaintiff has offered evidence that due to the design of the press line, specifically the placement of the unloader, the light curtain on Press No. 4 had to be deactivated. Therefore, even if Komatsu's omission was a proximate cause of the accident, a reasonable jury would necessarily find that the deactivation of the light curtain without the knowledge of Plaintiff was a superseding cause of the injury, which is sufficient to relieve Komatsu of any liability for not having provided a point of operation guards. Komatsu could not have reasonably foreseen that a point of operation guard subsequently installed would be deactivated without notice to Plaintiff.

Therefore, the Court GRANTS Defendants' motion with respect to Defendants' failure to adequately guard the press.

### C. The Installation of the Komatsu Press into an Unreasonably Dangerous or Defective Press Line

Plaintiff contends that Komatsu should not have permitted the installation of its press into a press line it knew or should have known was unreasonably dangerous or defective. Plaintiff raises concerns with the press line such as: (1) the location of the master control panel; (2) inadequate warning devices for the press line; and (3) the placement of the unloader, requiring the deactivation of Press No. 4's light curtain.

 In Tennessee the manufacturer of a component part may be held liable for a defect in its product even after its integration into a larger product, but the defect must be present in the component part itself.[10] *See Kellar v. Inductotherm Corp.*, 498 F.Supp. 172, 175 (E.D.Tenn. 1978). "[T]here is no basis for imposing liability upon the manufacturer of a product for damage caused by someone else's product, in the absence of proof that [the] damage was caused by a defect in the manufacturer's product." *Kellar,* 498 F.Supp. at 174–75 (quotation omitted). A Hawaii district court concisely stated the rationale for such a doctrine:

> A manufacturer of a nondefective component part has no duty to analyze the design and assembly of the completed product of an unrelated manufacturer to determine if the component is made dangerous by the integration into the finished product. The alleged foreseeability of the risk of the finished product is irrelevant to determining the liability of the component part manufacturer because imposing such a duty would force the supplier to retain an expert in every finished product manufacturer's line of business and second-guess the finished product manufacturer whenever any of its employees received any information about any potential problems.

*Kealoha v. E.I. Du Pont de Nemours & Co.*, 844 F.Supp. 590, 594 (D.Haw.1994) (citations omitted).

Plaintiff would have the Court reach a different result in this case, arguing that the press had an "independent function." However, the salient principle, that the manufacturer of a component product should not be held liable for a defective or unreasonably dangerous final product unless the condition of the final product is a result of a defective or unreasonably dangerous condition of the component product, is equally applicable when the component part could be operated independently but nevertheless is integrated into a final product. That Sharp could have operated the Komatsu press without it being integrated into the press line is not a sufficient basis for varying from this principle.

 In the case sub judice, the press cannot be considered defective or unreasonably dangerous simply because it failed to protect Plaintiff against any perceived defective or unreasonably dangerous condition of the press line. Plaintiff has not adduced evidence that Komatsu was involved with the design of the press line. Instead, the evidence indicates that the engineering department of Orii, after consultation with Sharp, designed the press line. Therefore, the Court finds that Komatsu as manufacturer of the press cannot be held liable for the conditions of the press line designed by Orii. Defendants' motion is GRANTED with regard to any arguably defective or unreasonably dangerous condition of the press line.

### D. Komatsu's Duty to Warn Plaintiff of the Danger of the Press

 Plaintiff argues that Komatsu failed to adequately warn the ultimate user of the press of the dangers associated with the foreseeable uses of the press. However, a product "is not unreasonably danger-

---

10. That the press was a component part of the press line is both plain and confirmed by Starr, who stated that the press was "a com-ponent in a very sophisticated system." *See* Starr Dep. at 77.

ous because of failure to warn of a danger that is apparent to the ordinary user." TENN.CODE ANN. § 29–28–105(d). As the U.S. Court of Appeals for the Sixth Circuit has observed in review of a case originating from the Eastern District of Michigan, "[t]he potential danger of a large industrial press is plainly obvious." *Walker v. Danly Mach. Corp.*, 812 F.2d 1409, 1987 WL 35872, at *3 (6th Cir. Jan.29, 1987) (upholding a trial judge's granting of summary judgment on the issue of failure to warn of danger). The Court agrees, and finds that the obvious danger of the press precludes recovery under a failure to warn theory.

 Moreover, even if the danger was not obvious, Komatsu provided sufficient warning in its safety handbook. A manufacturer's duty to warn those who ultimately use its product can be discharged by its reasonable reliance on an employer to convey information supplied by the manufacturer to its employees. *See Jacobs v. E.I. Du Pont De Nemours & Co.*, 67 F.3d 1219, 1244–45 (6th Cir.1995); *Whitehead v. Dycho Co., Inc.*, 775 S.W.2d 593, 598 (Tenn.1989); *Adams v. Union Carbide Corp.*, 737 F.2d 1453, 1457 (6th Cir.1984). Here, Komatsu provided detailed and explicit warnings regarding the press' dangers in its safety handbook. Its reliance on Sharp to pass along such warnings was reasonable. Therefore, the Court GRANTS Defendants' motion for summary judgment on Komatsu's duty to warn.

## CONCLUSION

For the reasons stated above, the Court GRANTS Defendants' motion for summary judgment. Plaintiff's motion for oral argument is DENIED. Defendants' motion for leave to file a motion for summary judgment on the issue of punitive damages is DENIED.

SO ORDERED.