IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
February 6, 2001 Session

## McARTHUR DAVIS v. KOMATSU AMERICA INDUSTRIES CORPORATION, ET AL.

**Rule 23 Certified Question of Law**
**United States Court of Appeals for the Sixth Circuit**
**No. 99-5799**

---

**No. M2000-01373-SC-R-23-CQ - Filed April 18, 2001**

---

Pursuant to Rule 23 of the Rules of the Supreme Court of Tennessee,[1] this Court accepted certification of the following question from the United States Court of Appeals for the Sixth Circuit:

> Does Tennessee products liability law include a "component parts doctrine" as described by the district court, and if so, what are the precise contours of the doctrine?

We conclude that Tennessee products liability law does include a component parts doctrine and that Section 5 of the Restatement (Third) of Torts: Products Liability (1997) is an accurate statement of the doctrine in Tennessee. We further conclude that the parameters of the doctrine are illustrated by comment e to Section 5.

### Tenn. Sup. Ct. R. 23 Certified Question of Law

FRANK F. DROWOTA, III, J., delivered the opinion of the court, in which E. RILEY ANDERSON, C.J., ADOLPHO A. BIRCH, JR., JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined.

Dean White, Memphis, Tennessee, for the petitioner, McArthur Davis.

Lee L. Piovarcy and Shea S. Wellford, Memphis, Tennessee, for the respondents, Komatsu America Industries Corporation and Komatsu Mexicana, S.A. de C.V., a subsidiary of Komatsu, Limited.

### OPINION

---

[1]"The Supreme Court may, at its discretion, answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, a District Court of the United States in Tennessee, or a United States Bankruptcy Court in Tennessee. This rule may be invoked when the certifying court determines that, in a proceeding before it, there are questions of law of this state which will be determinative of the cause and as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court of Tennessee."

# I. Factual & Procedural Background

The facts from which this lawsuit arose were described in detail by the Sixth Circuit in an unpublished opinion affirming the district court's decision granting summary judgment on Davis's claim against Komatsu for failure to warn.[2]  As stated in that opinion, the relevant facts are as follows:

> Davis was a twenty-five year old laborer who suffered a severe crush injury to his dominant hand while operating a press line at the Sharp Manufacturing Plant in Memphis, Tennessee. He brought this products liability suit against Defendants-Appellees Komatsu America Industries Corp. and Komatsu Mexicana, L.A. De C.V., a subsidiary of Komatsu, Ltd. (collectively "Komatsu"), and Orii Corporation of America and Orii Corporation ("Orii").  Davis settled his claims against Orii.  On April 16, 1999, the district court granted summary judgment for Komatsu.

> ## A. The Press Line

> Sharp operates a plant in Memphis that manufactures microwave ovens. Plant No. 3 contains automated press lines that stamp, form and assemble various parts used in the manufacture of the ovens. Specifically, the plant includes a 150- ton press line, the "200-1" press line (200 tons), and the "200-2" press line.  The former two lines were installed in 1992, while the 200-2 line, the one where Davis worked and was injured, was installed in 1994.  The line's design and layout were based on a drawing drafted by the engineering department of Orii, pursuant to Sharp's specifications. The 200-2 line includes six Komatsu presses, which arrived at Sharp between February 17 and March 11, 1994, and were installed by a Komatsu service technician.

> The Sharp press line operates as follows. First, the de-stacker feeds sheets of metal, or "blanks," into the press line.  Through the operation of two "jaws," the press then stamps the blanks into various shapes and punches pre-determined holes into the blanks. The hole-punching process creates scrap metal waste, or "slugs," which occasionally get caught in the press die,[3] causing the blank to deform.  After the blanks are shaped and punched by each press, they are transferred from press to press by transfer robots. At the last press in the line, an automated robot unloader removes the completed blank from the press die area and transfers it to a conveyor belt.[4]

> A press line operator and an unloader staff each press line.  The press line operator is generally in charge of the operation of the line, and of starting press line operations.  The unloader removes finished parts from the conveyor belt and stacks

---

[2] Davis v. Komatsu America Industries Corp. et al., No. 99-5579 (6th Cir. 2000).

[3] The die is the tool that forms and punches holes into the blanks.

[4] The robotic unloader has an expanded metal guard on each side designed to protect human unloaders from any potential danger associated with the moving parts of the robotic unloader.

them into baskets to transfer to other parts of the plant for further assembly. The unloader also inspects parts for quality control; if he notices a misformed part, he is to stop the line and notify the line operator. If a malformation is caused by a "slug," either the unloader or line operator will remove the slug from the press die area.

Each Komatsu press in the Sharp line has a safety device known as a "light curtain" attached to its front side. The light curtain projects an infrared beam of light between light posts. If the beam is broken by any object, the light curtain transmits a signal that a fault has occurred and the line shuts down. Under the 200-2 press line's layout, however, the robotic unloader on the last press (press No. 4), was placed in the area protected by the light curtain. Thus, the light curtain for Press No. 4 had to be deactivated for the press line to operate.

While each individual machine in a press line has its own control panel, each line also has an Orii master control panel used to control the individual machines. Numerous buttons on either the individual or master control panels shut down the line. When the master control panel is used to start the line, an alarm (manufactured, supplied and installed by Orii) sounds, and after a short delay, the line starts.

## B. Davis's Accident

Hired on June 6, 1996, Davis was working as an unloader on the 200-2 line on September 22, 1996. At one point, the line was shut down to switch from the manufacture of one part to another; the "change-over" technician (known as a "die-setter"), Wayne Holcomb, completed the required "change-over" and ran a limited test production run of the new part to be made. During that test run, Davis noticed a deformity in the blanks being pressed. He shut down the line by pressing a button on the unloader and signaled the problem to Holcomb. Davis and Holcomb then discussed the problem. After the discussion, Holcomb removed a slug from the die area and returned to the master control panel. Davis, thinking Holcomb was taking one of the deformed parts to the quality control office as part of normal procedure, approached Press No. 4, seeking to remove a slug from the die area. Reaching between the deactivated safety light curtain posts, Davis picked up a slug and was removing it when Holcomb restarted the line using the master control panel. Although the warning sounded, Davis contended he did not hear the sound. The press crushed Davis's dominant hand, resulting in the amputation of half of his thumb, his first three fingers, and part of the web of his hand.

After his injury, Davis filed a complaint against defendants in the Circuit Court of Shelby County, Tennessee. Both Komatsu and Orii removed the case to the United States District Court for the Western District of Tennessee. Davis alleged causes of action under the Tennessee Products Liability Act of 1978, Tenn. Code Ann. §§ 29-28-101 to 108 (1999). He argued that the press was dangerous and defective at the time it left Komatsu's control because there were not adequate guards

to prevent contact between the operator and the die area, and further contended that the configuration of the Komatsu presses at the Sharp plant was unreasonably dangerous due to the location of the master control panel, inadequate warning devices for the press line, and the required deactivation of the light curtain at Press No. 4.[5] Davis also alleged that Komatsu failed adequately to warn of the dangers of the foreseeable uses of the press. On February 12, 1999, Komatsu filed a Motion for Summary Judgment, to which Davis filed an Opposition Memorandum on March 22. On April 1, 1999, Davis gave notice to the district court that all claims against Orii had been settled. Komatsu and Davis subsequently filed supplemental memoranda regarding the issue of proximate cause.

On April 16, 1999, the district court granted summary judgment in favor of Komatsu, rejecting all of Davis's claims. The Court found in particular that the presses were not unreasonably dangerous when they left the Komatsu factory; that the presses had not been the proximate cause of Davis's injuries due to Sharp's installation and deactivation of the light curtain; that, as a matter of law, Komatsu could not be held liable for the broader press line unless the press itself was defective; and that Komatsu had not failed to adequately warn of the press's dangers. See Davis v. Komatsu America Industries Corp., et al., 46 F. Supp.2d 745, 750-54 (W.D. Tenn. 1999). Davis filed a timely notice of appeal.

The Sixth Circuit affirmed the district court's grant of summary judgment to Komatsu on Davis's failure to warn claim but contemporaneously certified to this Court the following question of law: Does Tennessee products liability law include a "component parts doctrine" as described by the District Court, and if so, what are the precise contours of that doctrine? We accepted certification of the question, and, for the reasons that follow, we conclude that the doctrine is a part of Tennessee law and that Section 5 of the Restatement (Third) of Torts: Products Liability (1997) and the comments thereto accurately reflect the parameters of the doctrine in Tennessee.

## II. Analysis

As described by the District Court, the component parts doctrine provides that a manufacturer who supplies a non-defective and safe component part generally will not be held liable for a

---

[5] Davis's expert witness, George Starr, examined the configuration of the presses at the Sharp plant and concluded that they were not safe. The expanded metal device in the Komatsu-Sharp line intended to provide safety "does not guard the machine adequately.... It is inadequate." J.A. at 1525. Starr elaborated that the set-up violated clear industry standards for protecting workers from hazardous machines, and that the guard in the press line "failed to prevent injury into the hazardous area." J.A. at 1527. Starr also testified that the audible warning that the press would restart was not loud enough, and also was not followed by a sufficient delay. J.A. at 1528. There was also no visual signal. J.A. at 1530. Starr stated that these problems were compounded by the fact that the operator starting the press line can not see all the work stations along the line. J.A. at 1531. With the arrangement at Sharp, "[y]ou cannot see all the work stations. You cannot see the area where I understand McArthur Davis was standing at the time of the accident." J.A. at 1533. Starr added that unless "the operator has in view all the points where accidents are waiting to happen, then it's not completely safe." J.A. at 1534. On cross-examination, Starr made clear that it was the press line that he was critiquing, and not the Komatsu press as a stand-alone, manufactured product. J.A. at 1538.

defective or unreasonably dangerous final product. However, when a component manufacturer participates in designing a defective or unreasonably dangerous final product, the component manufacturer may be held liable for injuries caused by the final product even though the component itself was not defective or unreasonably dangerous. See Davis, 46 F. Supp.2d at 753.

While no state court in Tennessee has discussed this doctrine, our research reveals both that the District Court's description is accurate and that every court presented with the issue has adopted the component parts doctrine.[6] In Re: TMJ Implants Products Liability Litigation, 872 F. Supp. 1019 (D. Minn. 1995), aff'd, 97 F.3d 1050 (8th Cir. 1996) (applying Minnesota law); Kealoha v. E.I. Du Pont de Nemours & Co., 844 F. Supp. 590 (D. Hawaii 1994), aff'd, Kealoha v. E.I. Du Pont de Nemours & Co., et al., 82 F.3d 894 (9th Cir. 1996) (applying Hawaii law); Jacobs v. E.I. Du Pont de Nemours & Co., 67 F.3d 1219 (6th Cir. 1995) (applying Ohio law); Apperson v. E.I. Du Pont de Nemours & Co., 41 F.3d 1103 (7th Cir. 1994) (applying Illinois law); Crossfield v. Quality Control Equip. Co., Inc., 1 F.3d 701 (8th Cir. 1993) (applying Missouri law); Childress v. Gresen Mfg. Co., 888 F.2d 45 (6th Cir. 1989) (applying Michigan law); In Re: Silicone Gel Breast Implants Products, 996 F. Supp. 1110 (N.D. Ala. 1997); Travelers Ins. Co. v. Chrysler Corp., 845 F. Supp. 1122 (M.D.N.C. 1994); Sperry v. Bauermeister, 782 F. Supp. 1512 (E.D. Mo. 1992); Estate of Carey v. Hy-Temp Mfg., Inc., 702 F. Supp. 666 (N.D. Ill. 1988); Orion Ins. Co., Ltd. v. United Tech. Corp., 502 F. Supp. 173 (E.D. Pa. 1980); Mayberry v. Akron Rubber Machinery Corp., 483 F. Supp. 407 (N.D. Okla. 1979); Artiglio v. General Electric Co., 71 Cal. Rptr. 2d 817 (Cal. Ct. App. 1998); Bond v. E.I. Du Pont de Nemours & Co., 868 P.2d 1114 (Colo. Ct. App. 1993); Shaw v. General Motors Corp., 727 P.2d 387 (Colo. Ct. App. 1986); Castaldo v. Pittsburg-Des Moines Steel Co., Inc., 376 A.2d 88 (Del. 1977); Depre v. Power Climber, Inc., 635 N.E.2d 542 (Ill. App. Ct. 1994); Curry v. Louis Allis Co., Inc., 427 N.E.2d 254 (Ill. App. Ct. 1981); Murray v. Goodrich Eng'g Corp., 566 N.E.2d 631 (Mass. App. Ct. 1991); Welsh v. Bowling Electric Machinery, Inc., 875 S.W.2d 569 (Mo. Ct. App. 1994); Zaza v. Marquess & Nell, Inc., 675 A.2d 620 (N.J. 1996); Parker v. E.I. Du Pont de Nemours & Co., Inc., 909 P.2d 1 (N.M. Ct. App. 1995); Munger v. Heider Mfg. Corp., 456 N.Y.S.2d 271 (N.Y. App. Div. 1982); Hoyt v. Vitek, Inc., 894 P.2d 1225 (Or. Ct. App. 1995); Moor v. Iowa Mfg. Co., 320 N.W.2d 927 (S.D. 1982); Davis v. Dresser Indus., Inc., 800 S.W.2d 369 (Tex. App. 1990); Bennett v. Span Indus., Inc., 628 S.W.2d 470 (Tex. App. 1982); Westphal v. E.I. Du Pont de Nemours & Co., 531 N.W.2d 386 (Wis. Ct. App. 1995); Noonan v. Texaco, Inc., 713 P.2d 160 (Wyo. 1986).

Among the many courts adopting and applying the component parts doctrine are two decisions of the United States District Court for the Eastern District of Tennessee. See Miller v. E.I. Du Pont de Nemours & Co., 811 F. Supp. 1286 (E.D. Tenn. 1992); Kellar v. Inductotherm Corp., 498 F. Supp. 172 (E.D. Tenn. 1978).

---

[6]When discussing the issue, some of the cited cases use the phrase "raw materials supplier defense" rather than "component parts doctrine." Although different phrases are used, the principle is the same. See In Re: TMJ Implants Products Liability Litigation, 97 F.3d 1050, 1055 n.6 (8th Cir 1996).

In <u>Kellar</u>, the defendant manufactured and sold a furnace to the plaintiff's employer. Although the defendant was aware of the employer's plans for installing the furnace, the defendant did not design the plan of installation, which resulted in a small open space pit around the furnace. The plaintiff was injured when he fell into the pit. Although the jury returned a verdict in favor of the plaintiff, the trial court granted the defendant's motion for judgment notwithstanding the verdict. In so doing, the district court stated as follows:

> In this case, the furnace in question served as but one small component of a larger foundry system designed and built by Vestal [the employer]. There is no allegation by plaintiffs that the furnace was in any way defective concerning its own function of heating and storing metals. The dangerous condition of the open pit was created by Vestal, not by defendant. Plaintiff's contention is essentially that the furnace was defective because it failed to protect plaintiff from a danger created by Vestal, a third party. Plaintiffs have failed to show any authority for holding the manufacturer of a component part liable under such a theory. The manufacturer of a component part certainly may be held liable for a defect in its product, even after that part is assembled into a larger product. But the defect must be present in the "self-contained component part" itself. Here the furnace could not be held defective in and of itself merely because it failed to protect plaintiff against Vestal's design and construction.

<u>Kellar</u>, 498 F. Supp. at 175 (internal footnotes and citations omitted).

Relying upon <u>Kellar</u>, the district court in <u>Miller</u> held that, under Tennessee law, a supplier of a non-defective raw material used to manufacture a medical device that is allegedly defectively designed and/or manufactured is not liable to a consumer who was allegedly injured by the medical device. In so holding, the district court concluded that under Tennessee law a manufacturer of raw materials has no duty to anticipate how a non-defective, safe raw material can become potentially dangerous depending upon the nature of its integration by another manufacturer into the final product. <u>See</u> <u>Miller</u>, 811 F. Supp. at 1294.

The decisions of Eastern District Court in Tennessee as well as the decisions from other jurisdictions recognize that the component parts doctrine is based on the premise that
> [t]he obligation that generates the duty to avoid injury to another which is reasonably foreseeable does not . . . extend to the anticipation of how manufactured components not in and of themselves dangerous or defective can become potentially dangerous dependent upon the nature of their integration into a unit designed, assembled, installed, and sold by another.

<u>Zaza</u>, 675 A.2d at 629-30 (quoting <u>Jordan v. Whiting Corp.</u>, 212 N.W.2d 324, 328 (Mich. Ct. App. 1973)). Similarly, the United States Court of Appeals for the Eighth Circuit has explained:

[t]o impose responsibility on the supplier of [the component] in the context of the larger defectively designed machine system would simply extend liability too far. This would mean that suppliers would be required to hire machine design experts to scrutinize machine systems that the supplier had no role in developing. Suppliers would be forced to provide modifications and attach warnings on machines that they never designed nor manufactured. Mere suppliers cannot be expected to guarantee the safety of other manufacturers' machinery.

Crossfield, 1 F.3d at 704; see also Apperson, 41 F.3d at 1108 (quoting Kealoha, 844 F. Supp. at 594) ("[I]mposing such a duty would force [component part manufacturers] to retain an expert in every finished product manufacturer's line of business and second-guess the finished product manufacturer whenever any of its employees received any information about any potential problems."). And finally, the court in Orion observed that:

[N]o public policy can be served by imposing a civil penalty on a manufacturer of specialized parts of the highly technical machine according to the specifications supplied by one who is expert at assembling these technical machines, who does so without questioning the plans or warning of the ultimate user. The effect of such a decision on component parts manufacturers would be enormous. They would be forced to retain private experts to review an assembler's plans and to evaluate the soundness of the proposed use of the manufacturer's parts. The added cost of such procedure both financially and in terms of stifled innovation outweighs the public benefit of giving plaintiffs an additional pocket to look to for recovery.

502 F. Supp. at 178.

Consistent with the overwhelming weight of authority, the drafters of the Restatement (Third) of Torts: Products Liability (1997) included a streamlined and simplified statement of the doctrine as follows:

§5.    Liability of Commercial Seller or Distributor of Product Components for Harm Caused by Products into Which Components are Integrated

One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:

(a) the component is defective in itself . . .and the defect causes the harm; or

(b)(1)the seller or distributor of the component substantially participates in the integration of the component into the design of the product; and

(2) the integration of the component causes the product to be defective . . .; and

(3) the defect in the product causes the harm.

Echoing the judicial decisions discussing this issue, comment a explains the rationale for Section 5 as follows:

> If the component is not itself defective, it would be unjust and inefficient to impose liability solely on the ground that the manufacturer of the integrated product utilizes the component in a manner that renders the integrated product defective. Imposing liability would require the component seller to scrutinize another's product which the component seller has no role in developing. This would require the component seller to develop sufficient sophistication to review the decisions of the business entity that is already charged with responsibility for the integrated product.

Comment e clarifies the parameters of the liability described by Section 5(b):

> When the component seller is substantially involved in the integration of the component into the design of the integrated product, the component seller is subject to liability when the integration results in a defective product and the defect causes harm to the plaintiff. Substantial participation can take various forms. The manufacturer or assembler of the integrated product may invite the component seller to design a component that will perform specifically as part of the integrated product or to assist in modifying the design of the integrated product to accept the seller's component. Or the component seller may play a substantial role in deciding which component best serves the requirements of the integrated product. When the component seller substantially participates in the design of the integrated product, it is fair and reasonable to hold the component seller responsible for harm caused by the defective, integrated product. A component seller who simply designs a component to its buyer's specifications, and does not substantially participate in the integration of the component into the design of the product, is not liable within the meaning of Subsection (b). Moreover, providing mechanical or technical services or advice concerning a component part does not, by itself, constitute substantial participation that would subject the component supplier to liability.

Having fully reviewed numerous authorities describing and defining the doctrine, we conclude that Tennessee products liability law recognizes and includes the component parts doctrine.

In a series of cases beginning in 1966, this Court approved the theory of strict liability as expressed in Section 402A of the Restatement (Second) of Torts (1965). See Whitehead v. Toyota Motor Corp., 897 S.W.2d 684, 688-89 (Tenn. 1995) (discussing the cases). Thereafter, the General Assembly enacted the Tennessee Products Liability Act of 1978, currently codified at Tenn. Code

Ann. §§ 29-28-101 to 108.[7] The cornerstone of the 1978 Act is now codified at Section 105(a) and provides as follows:

> (a) A manufacturer or seller of a product shall not be liable for any injury to a person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.

"Manufacturer" is defined by the statute to include "the designer, fabricator, producer, compounder, processor or assembler of any product <u>or its component parts.</u>" Tenn. Code Ann. § 29-28-102(4) (emphasis added). The statute further provides that no product liability action based on the doctrine of strict liability in tort "shall be commenced or maintained against any seller of a product which is alleged to contain or possess a defective condition unreasonably dangerous to the buyer, user or consumer <u>unless the seller is also the manufacturer of the product or the manufacturer of the part thereof claimed to be defective</u>. . . ." Tenn. Code Ann. § 29-28-106(b) (emphasis added). Finally, the statute provides that a manufacturer or seller is not liable "[i]f a product is not unreasonably dangerous at the time it leaves the control of the manufacturer or seller but was made unreasonably dangerous by subsequent unforeseeable alteration, change, improper maintenance or abnormal use." Tenn. Code Ann. § 29-28-108.

From the plain language of these statutory provisions, two principles are apparent. First, the term "manufacturer" used in the statute includes manufacturers of component parts. Second, a manufacturer of a component part clearly is liable for injuries caused by a component that was defective or unreasonably dangerous at the time it left the control of the manufacturer.[8] Accordingly, consistent with the many decisions from other jurisdictions cited herein and with Section 5(a) of the Restatement, Section 106(b) imposes liability upon a component manufacturer for injuries caused by a component that was defective or unreasonably dangerous at the time it left the manufacturer's control.

---

[7]The statute provides that a plaintiff is required to prove that the product either was defective or unreasonably dangerous at the time it left the control of the manufacturer or seller. Under this Court's decisions adopting Section 402A, a plaintiff was required to prove that the product was both defective and unreasonably dangerous. <u>See</u> <u>Fulton v. Pfizer Hosp. Products Group, Inc.</u>, 872 S.W.2d 908, 911 n.1 (Tenn. Ct. App. 1993).

[8]Defective condition is defined to mean "a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." Tenn. Code Ann. § 29-28-102(2). And, a product is "unreasonably dangerous" if the product is

> dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller assuming that the manufacturer or seller knew its dangerous condition.

Tenn. Code Ann. § 29-28-102(8).

While no Tennessee statutory provision speaks directly to the situation addressed by Subsection 5(b) of the Restatement (Third), we conclude that Tennessee law does support imposition of liability when a component manufacturer substantially participates in the integration of the non-defective component into the design of the final product, if the integration of the component causes the final product to be defective and if the resulting defect causes the harm.

Our conclusion is based in part upon the obvious converse implication of Tenn. Code Ann. § 108. Specifically, if a manufacturer is <u>not</u> liable for injuries when its non-defective, safe product is "made unreasonably dangerous by subsequent unforeseeable alteration, change, improper maintenance or abnormal use,"[9] as Section 108 provides, it is logical to conclude that liability is appropriate when a component manufacturer substantially participates in integrating its non-defective, safe component into the <u>design</u> of a final product, the integration causes the final product to be defective, and the resulting defect causes the harm. When a manufacturer substantially participates in the integration of its component into the design of the final product, any alteration or change to the component would be foreseeable, and the use of the component could not be defined as abnormal if it was recommended by the manufacturer. Our conclusion is supported by <u>Parker v. Warren</u>, 503 S.W.2d 938 (Tenn. Ct. App. 1973). In that case, the Court of Appeals refused to find a supplier of lumber strictly liable for injuries sustained by the plaintiff when the bleachers on which she was sitting collapsed, because the supplier did not know that the lumber was to be used to build bleachers, and the supplier did not recommend that the buyer use the inferior grade of lumber that was used for the project. From this holding it is apparent that a supplier or manufacturer of a component part has no independent duty under Tennessee law to anticipate how safe, non-defective components may become potentially dangerous when a third party integrates the component into a finished product that was designed by that party.

The decision in <u>Parker</u> is consistent in principle with Section 5(b) and specifically with comment e explaining the proper application of Section 5(b). We hereby adopt both Section 5(b) and comment e. We emphasize that "[a] component seller who simply designs a component to its buyer's specifications, and does not substantially participate in the integration of the component into the <u>design</u> of the product," is not liable. Comment e, Section 5(b), <u>Restatement (Second) of Torts: Products Liability</u> (1997) (emphasis added.) In addition, "providing mechanical or technical services or advice concerning a component part does not, by itself, constitute substantial participation that would subject the component supplier to liability." <u>Id.</u>

### III. Conclusion

In response to the certified question, we conclude that Tennessee products liability law includes the component parts doctrine and that Section 5 of the <u>Restatement (Third) of Torts: Products Liability</u> (1997) is an accurate statement of the doctrine. The parameters of the doctrine in Tennessee are adequately explained by comment e to Section 5.

---

[9]Tenn. Code Ann. § 29-28-108.

-10-

Having answered the certified question, the Clerk is directed to transmit a copy of this opinion in accordance with Tennessee Supreme Court Rule 23(8).[10]  Costs in this Court are taxed to the petitioner, McArthur Davis.

_____

FRANK F. DROWOTA, III, JUSTICE

---

[10] Both at oral argument and in their briefs, the parties have focused upon their respective version of the facts and have essentially urged this Court to decide whether the District Court properly granted summary judgment in this case.  That is beyond the scope of the question certified to us by the United States Court of Appeals for the Sixth Circuit.